UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRINA KOISTRA; and LARRY FORD,<br><br>                                    Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO; PLUTARCO VAIL, and DOES 1 through 50, inclusive,<br><br>                                    Defendants. | Case No.:  16cv2539-GPC(AGS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[Dkt. No. 52.]** |

Before the Court is Defendants' motion for summary judgment.  (Dkt. No. 52.) Plaintiff filed a reply and Defendants replied.  (Dkt. No. 58, 60.)  Based on a careful review of the briefs, the supporting documentation and the applicable law, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment.

## Background

The original complaint was filed on October 12, 2016.  (Dkt. No. 1.)  After the Court granted Plaintiffs' ex parte application to amend the complaint, (Dkt. No. 25), on August 16, 2017, Plaintiffs Trina Koistra ("Koistra") and Larry Ford ("Ford") filed an

amended complaint ("FAC") against the County of San Diego ("County") and Sheriff's Deputy Plutarco Vail ("Deputy Vail") (collectively "Defendants"). (Dkt. No. 26.) On October 19, 2017, in ruling on Defendants' motion to dismiss the FAC, the Court granted in part and denied in part the motion with leave to amend. (Dkt. Nos. 34, 42.) Plaintiffs Koistra and Ford filed a second amended complaint ("SAC") on October 26, 2017.[1] (Dkt. No. 43, SAC.) Defendants move for summary judgment solely on Koistra's causes of action and include the following:

1.     First Cause of Action - 42 U.S.C. § 1983 claim for excessive force under the Fourth Amendment;

2.     Third Cause of Action - Monell[2] liability for the County's unconstitutional custom, practice or policy;

3.     Fourth Cause of Action - violation of California Civil Code section 52.1;

4.     Fifth Cause of Action - false arrest/false imprisonment;

5.     Sixth Cause of Action - battery;

6.     Seventh Cause of Action – assault;

7.     Eighth Cause of Action - intentional infliction of emotional distress; and

8.     Ninth Cause of Action – negligence.

 (Dkt. No. 43, SAC.)

---

[1] In their motion, Defendants contend that the Court dismissed with prejudice all of Ford's claims against the County and Deputy Vail. (Dkt. No. 52-1 at 16.) The Court disagrees that the Court's order on the motion to dismiss the FAC dismissed Ford's claims with prejudice. (See Dkt. No. 42.) Moreover, Ford is named as a Plaintiff in the SAC. (Dkt. No. 43.) However, it appears Ford may not have any valid claims against Defendants. The sole constitutional claim alleged by Ford is the second cause of action for an unreasonable seizure against Does 1 through 25 but Ford has not moved to amend the SAC to name these Doe defendants. Ford also alleges Monell liability against the County, violation of California Civil Code section 52.1, false arrest, intentional infliction of emotional distress and negligence based on the allegations related to the unreasonable seizure claim. (Id.) Plaintiff does not dispute Defendants' characterization as to the status of Ford's claims. However, neither party has moved to dismiss Ford as a Plaintiff; therefore, procedurally, his claims remain.

[2] Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978).

2

The San Diego Regional Fugitive Task Force ("FTF") is a multi-agency task force that pursues persons wanted for violent crimes and significant narcotic offenses in the San Diego Area. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 1.) On December 22, 2015, the Superior Court of California issued a bench warrant for the arrest of Rory Fay ("Fay") for violating the terms of his probation. (Id., No. 2.) FTF was assigned to search for Fay, who was identified as a person of interest in connection with the homicide of Bren Fisher that occurred around January 7, 2016. (Id., Nos. 3, 4.) Based on database searches, FTF detectives learned that "Mr. Fay had an active no-bail felony warrant for his arrest for possession of a controlled substance while armed, was on probation as a post release offender, had two prior felony strikes, had a psychiatric inmate history, and had a history of drug and steroid abuse." (Id., No. 5.)

Using cell phone tracking technology, the FTF learned that Fay's cell phone was in the mobile home residence located at 250 La Cresta Heights Road, No. 3, El Cajon, California 92021 which is where Plaintiff Koistra lived. (Id., Nos. 6, 7.) FTF also learned that Koistra was a convicted felon with drug and theft history, was subject to arrest for violating her probation and waived her Fourth Amendment right as a condition of her probation. (Id., No. 8.)

From 2008 to April 2, 2016, Deputy Plutarco Vail was a canine handler with the County of San Diego Sheriff's Department ("Sheriff's Department"). (Id., No. 9.) As a canine handler, Deputy Vail was regularly called upon to participate in hot calls and high risk searches for wanted and dangerous felons. (Id., No. 10.)

On the evening of January 8, 2016, Fay helped Koistra get a ride home from a nail salon with a man unknown to her. (Id., No. 13.) Fay was an acquaintance of Koistra who had met her once or twice about a year ago. (Id., No. 12; Dkt. No. 52-2, Ds' NOL, Ex. F, Koistra Depo. at 26:12-20; 29:4-24.) Koistra, Fay and this unknown man drove to

Koistra's home and spent about one hour in her bedroom looking at decorations. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 14.) Koistra does not remember if she, Rory Fay or this unknown man used any drugs that evening. (Id., No. 15.) The unknown man left but Fay spent the night at Koistra's residence with her permission. (Id., No. 16.)

On the morning of January 9, 2016, Deputy Vail, and his canine Hank, were called upon to assist the FTF in the search for Fay. (Id., No. 17.) That morning, the FTF briefed Deputy Vail informing him that Fay was a wanted felon, a person of interest in a recent homicide, had two prior felony strikes, was considered to be armed and dangerous, and had a history of drug abuse and had a psychiatric inmate history. (Id., No. 18.) Immediately after a briefing, Deputy Vail looked Fay up on the Sheriff Department's Jail Inmate Management System and learned that Fay was on parole, was a two-striker, and had numerous arrests for narcotics, firearm possession and acts of violence. (Id., No. 19.) On that morning, Probation Officer Bobbitt informed Deputy Vail that the residence to be searched was the home of Koistra, who was a convicted felon with drug and theft history, was on probation, had waived her Fourth Amendment rights as a condition of that probation, and if found during the search, was subject to arrest for violating the terms of her probation. (Id., No. 20.) When the FTF team and Deputy Vail arrived on the scene, a perimeter had been set up around the residence. (Id., No. 21.) A helicopter from the Department's Aerial Support to Regional Enforcement Agencies ("ASTREA") was flying overhead to assist the FTF to monitor perimeter positions and provide aerial surveillance in the event Fay fled out of the perimeter. (Id., No. 22.) There were approximately five law enforcement vehicles, plus approximately ten deputies and/or police officers on scene at that time. (Id., No. 23.)

Standing approximately fifteen feet from the front door, Sergeant Christopher Davis ("Sergeant Davis") of the FTF used a handheld Public Announcement ("PA") system to make the following announcements:

> "Sheriff's department on a probation check, exit the trailer now"
> "If anyone is inside, you need to exit now"
> "Sheriff's department we have a canine, if you do not come out you will be bit."

(Id., No. 24.) These commands were repeated for about ten to fifteen minutes. (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 5; id., Ex. B, Perata Decl. ¶ 6; id., Ex. C, Davis Decl. ¶ 6; id., Ex. D, Bobbit Decl. ¶ 6; id., Ex. E, Miller Decl. [3] ¶ 4.) Koistra testified that she did not hear these announcements. (Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 69:21-23; 71:20-25; 72:7-11.) Koistra was prescribed and may have taken Lithium, Depakote, Xanax, and Norco within 24 hours of this incident. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 37.)

After Sergeant Davis's announcements, Larry Ford, Koistra's boyfriend, voluntarily exited the front door of residence. (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 6; id., Ex. B, Perata Decl. ¶ 6; id., Ex. C, Davis Decl. ¶ 6; id., Ex. D, Bobbitt Decl. ¶ 6; id., Ex. E, Miller Decl. ¶ 5; Dkt. No. 52-2, Ds' NOL, Ex. F, Koistra Depo. at 39:5-6.) Ford reported that the only other person in the trailer was an elderly white female. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 26.) After Ford came out, Sergeant Davis repeated the same announcement for about another ten minutes. (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 5; id., Ex. B, Perata Decl. ¶ 6; id., Ex. C, Davis Decl. ¶ 6; id., Ex. D, Bobbitt Decl. ¶ 6; id., Ex. E, Miller Decl. ¶ 6.) Koistra testified she did not hear this set of commands. (Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 69:21-23; 71:20-25; 72:7-11.) However, Koistra admitted in her response to a request for admission that she heard law enforcement announcing their presence before they entered the home. (Dkt. No. 52-2, Ds' NOL, Ex. N at 110, id., Ex. O at 116.)

---

[3] Jack Miller was a witness and resides at 250 La Cresta Heights Road, Space 5 in El Cajon, CA which is located 25 to 30 yards from Koistra's residence. (Dkt .No. 52-2, Ds' NOL, Ex. E.)

On the day of the incident, Koistra was awoken by the sound of a helicopter flying overhead and when she looked out her living room window, she saw more than ten police officers surrounding her house. (Dkt. No. 58-1, P's Response to Ds' SSUF, Nos. 29, 30.) Koistra believed the officers were there for her because she had violated the terms of her probation. (Id., No. 31.) She went to hide in the closet of her mother's bedroom. (Id., No. 32.)

A team of five officers, including Deputy Perata, Deputy Vail, and his canine, lined up in a single file at the front door of the residence with the intent to enter and search for Fay. (Id., No. 33.) While standing at the front door of the residence, with the front door open, Deputy Perata made multiple loud verbal commands such as "Sheriff's department with a canine, come out or you will be bit." (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 7; id., Ex. B, Perata Decl. ¶ 7; id., Ex. C, Davis Decl. ¶ 7; id., Ex. D, Bobbitt Decl. ¶ 7; id., Ex. E, Miller Decl. ¶ 7.) Koistra testified she did not hear any announcements or commands. (Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 69:21-23; 71:20-25; 72:7-11.) There was no response to Deputy Perata's commands. (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 7; id., Ex. B, Perata Decl. ¶ 7; id., Ex. C, Davis Decl. ¶ 7; id., Ex. D, Bobbitt Decl. ¶ 7.)

The FTF entry team methodically cleared the house. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 38.) During the search, Deputy Vail held Hank by his collar. (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 8.) Deputies Perata and Vail proceeded to one of the bedrooms where Georgia Koistra, Kostra's mother, was standing with a walker. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 40.) The television in Georgia's bedroom was on at a very high volume and it appeared that Georgia had difficulty hearing. (Id., No. 41.) Deputy Perata yelled commands to her to exit and because that did not work, he made motions with his hands instructing Georgia to exit the bedroom which she did and

6

was escorted out by another member of the entry team. (Id., Nos. 42, 44.) Koistra could hear the officers talk to her mother while hiding in the closet. (Id., No. 43.)

The parties' recitation of the facts dramatically diverge at this point. According to Defendants, while standing at the threshold of the bedroom door, Deputy Vail made two loud verbal commands of "Sheriff's department with a dog, come out or you will be bit." (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 10; id., Ex. B., Perata Decl. ¶ 10.) Koista denies hearing this command as well. (Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 71:20-25; 72:7-11.) Deputies Vail and Perata waited a short period of time, listened, and received no response. (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 10; id., Ex. B., Perata Decl. ¶ 10.)

At that point, Deputy Vail released Hank's collar and gave him a command to search. (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 10.) Hank went to the closet, stuck his head in, which was partially open, but could not enter because of the clutter. (Id.) Officer Vail went to the closet, slid the door open and Hank lunged inside. (Id.) There was substantial clutter and clothing that prevented him from seeing Hank's head. (Id.) Deputy Vail moved forward and pulled the clothing away from Hank and then saw him making contact with someone who was squatting down and hiding under a blanket in the far rear corner of the closet. (Id.) That person did not make any noise but then he heard a female voice say "ahhh." (Id.) Deputy Vail removed the blanket and saw it was a female. (Id.) As Koistra was attempting to stand up, it forced Hank onto his hind legs. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 56.)

Once Deputy Vail realized she was not Fay, he removed Hank from his contact. (Dkt. No. 52-2, Ds' NOL, Ex. A, Vail Decl. ¶ 11.) Deputy Vail states that Hank had contact with Koistra for about 15 seconds or less. (Id.) Because Fay had not yet been discovered, it was important to quickly remove Hank from his contact because Fay could use this encounter to ambush the officers. (Id.) Koistra was handcuffed and removed

from the vicinity. (Id.) After the incident, Deputy Vail was interviewed and he stated that Hank's bite lasted about 30 seconds.[4] (Dkt. No. 58-2, Peacock Decl., Ex. F at 71.)

Koistra testified that when she heard the helicopters above, she thought the officers were there for her probation violation. (Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 69:11-13; 71:17-19.) She then went to hide in the closet of her mother's room where the TV was very loud. (Id. at 73:16-19; 75:7-18.) She described herself as sitting down behind a chair halfway in the closet and her feet, not her legs, were hanging out behind the chair. (Id. at 73:24-74:1; 74:17-19; Dkt. No. 52-2, Ds' NOL, Ex. F, Koistra Depo. at 76:14-18.) Her mom's closet has two sliding closet doors and one was open because it was stuck. (Dkt. No. 52-2, Ex. F, Koistra Depo. at 74:11-16.) While she was in the closet, her mother was on her bed. (Id. at 75:23-25.) If someone is standing in the bedroom door of her mother's room, the person would not be able to see her in the closet. (Id. at 76:19-22.) Koistra vaguely recalls that while she was in the closet, the police officers were talking to her mother before taking her outside the bedroom. (Id. at 77:1-12.) Koistra stated she did not hear any of the commands. (Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 71:20-25.)

Afterwards, an officer came to the bedroom door and told her to come out. (Dkt. No. 52-2, Ex. F, Koistra Depo at 77:15-16.) While in a sitting position, she responded by putting her arms up and said, "What's going on. I'm unarmed" and she noticed the officer had a "SWAT gun" in his hand. (Id. at 77:16-23; Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 78:18-25.) At the time, the TV was still on, and she did not see or hear a dog and did not hear whether the officer said he had a dog. (Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 78:5-10.)

---

[4] No date is referenced as to the date of the interview.

Seconds after she put her arms up and said "I'm unarmed", the dog came and bit her left finger. (Id. at 79:11-12.) Then the dog bit her left hand "all the way through." (Id. at 79:15-16.) She did not hear the officer say anything to the dog and he was not doing anything. (Id. at 79:24-80:1; 80:2-15.) The dog also bit her on her left arm, mouth, both sides of her face, the back of her head, and broke her jaw. (Id. at 80:21-81:6.) The dog also began to pull her by her mouth with his teeth and dragged her out of the bedroom into the living room for a distance of about twelve feet. (Id. at 81:20-21; 88:6-89:2.) She did not hear any commands from any of the officers while she was in the bedroom. (Id. at 89:3-6.) When she was in the living room, the officers yelled a command at the dog and he bit her again on the mouth right in the jaw with his tooth in her mouth. (Id. at 89:7-16.) After that bite, the officer physically grabbed the dog by his head. (Id. at 89:17-25.)

Koistra testified she was in shock and in and out of consciousness during the encounter with Hank. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 58.) She also testified that she does not remember how long her encounter with Hank lasted because she was in shock but guessed it was a matter of seconds. (Dkt. No. 52-2, Ds' NOL, Ex. F, Koistra Depo. at 81:9-18; 85:25-86:6; 111:25-112:12.) Emergency medical services were requested for Koistra about ten minutes later. (Dkt. No. 58-2, Peacock Decl., Ex. F at 71.)

Koistra was removed from the vicinity by another deputy while Deputies Vail and Perata proceeded to the only remaining bedroom in the residence left to be cleared. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 61.) In the last bedroom, Hank found and bit Fay who was hiding under the bed. (Id., No. 62.) After some resistance, the deputies were able to wrestle Fay onto his stomach and get him handcuffed. (Id., No. 63.) Fay was arrested pursuant to the outstanding bench warrant. (Id., No. 64.) Fay was later

charged, pled guilty, convicted, and sentenced to 25 years to life for first degree murder for the death of Bren Fisher.  (Id., No. 65.)

Koistra was arrested for violating Penal Code sections 1203.2(a) (violation of probation), 32 (harboring a felon) and 148 (delaying/resisting an officer).  (Id., No. 66.) Koistra later admitted and was convicted of violating the terms of her probation.  (Id., No. 67.)  As a result of that conviction, Trina Koistra was sentenced to 270 days in jail and her probation extended another year.  (Id., No. 68.)

**A.    Request for Judicial Notice**

Defendants filed a request for judicial notice of state court criminal filings and include an appearance on a warrant against Koistra dated January 21, 2016, a felony complaint against Fay filed on January 19, 2016, a plea of guilty by Fay filed on February 27, 2017, Koistra's probation hearing/sentencing held on July 31, 2013, an ex parte bench warrant in the Fay state criminal case, and an abstract of judgment filed October 3, 2017 against Fay.  (Dkt. No. 52-3.)  Plaintiff did not file an opposition to the request.

Under Federal Rule of Evidence 201(b), a district court may take notice of facts not subject to reasonable dispute that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b); see also Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (noting that the court may take judicial notice of undisputed matters of public record).  Defendants seek judicial notice of documents filed with the state court; therefore, the Court finds the documents properly subject to judicial notice.  The Court GRANTS Defendants' request for judicial notice.

**B.    Legal Standard on Motion for Summary Judgment**

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477

U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  Celotex Corp., 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial.  Id. at 322-23.  If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324.  If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law.  Id. at 325.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party."  Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact.  Anderson, 477 U.S. at 255.

**C.   First Cause of Action – 42 U.S.C. § 1983 - Excessive Force**

In the SAC, Koistra alleges an excessive force claim in violation of her Fourth Amendment right against Deputy Vail.  (Dkt. No. 43, SAC ¶¶ 51-54.)  Specifically, Koistra asserts that (1) the deployment of a canine was unreasonable under the circumstances and (2) the continued and prolonged use of the canine to bite her for 30 seconds after she had surrendered was unreasonable.  (Dkt. No. 58 at 15-18.[5])  Defendants argue that Deputy Vail's use of force on Koistra was reasonable under the facts of the case and did not violate the Fourth Amendment.  Plaintiff responds that a resolution of this issue is a question of fact to be presented to a jury.

Section 1983 provides plaintiffs with a cause of action when a person acting under the color of state law deprives them of any federal constitutional right.  42 U.S.C. § 1983.  An excessive force claim in the course of a law enforcement's "seizure" is analyzed under the Fourth Amendment's "objective reasonableness" standard.[6]  Graham v. Connor, 490 U.S. 386, 388 (1989).  Objective reasonableness is determined "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397.  "The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Id. at 396.

The reasonableness of a seizure is determined by balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  United States v. Place, 462

---

[5] Page numbers are based on the CM/ECF pagination.

[6] A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."  Brower v. Cnty. of Inyo, 489 U.S. 593, 597 (1989)(emphasis omitted).  "A seizure occurs even when an unintended person or thing is the object of the detention or taking" but the seizure must be willful.  Id. at 596.  Here, while Plaintiff was not the person the FTF intended to seize, a seizure nevertheless occurred because the officers' actions were intentional.

12

U.S. 696, 703 (1983).  In determining whether the manner of a seizure is objectively reasonable, courts consider: "(1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'"  Lowry v. City of San Diego, 858 F.3d 1248, 1256 (9th Cir. 2017) (*en banc*) (quoting Glenn v. Washington Cnty., 673 F.3d 864, 871 (9th Cir. 2011)).

**1. Type of Force Used**

First, as to the type and amount of force used, the Court looks to the factual circumstances.  Lowry, 858 F.3d at 1256.  In Lowry, a recent Ninth Circuit case involving the use of a police canine, the court summarized some of its precedent on canine use:

> In Smith v. City of Hemet, 394 F.3d 689, 701–02 (9th Cir. 2005) (en banc), we held that the use of a police dog constituted excessive force where the officers sicced the dog on the plaintiff three times, including once after he had already been pinned down, and then pepper sprayed his open wounds. Similarly, in Chew [v. Gates], we concluded that "the force used to arrest [the plaintiff] was severe" because the dog bit the plaintiff three times, dragged him between four and ten feet, and "nearly severed" his arm.  27 F.3d at 1441.  On the other hand, in Miller v. Clark County, we held that the use of force, although considerable and serious, was nonetheless reasonable and did not rise to the level of "deadly force," even though the dog apprehended a fleeing suspect with a bite that lasted between forty-five and sixty seconds, "shredded" the plaintiff's muscles, and reached the bone. 340 F.3d at 961–66.

Lowry, 858 F.3d at 1256–57.  Based on these cases, the Lowry court concluded that the use of force, in its case, was "moderate" and not severe where the officer was closely following behind the canine and called the canine off quickly after the initial contact.  Id. at 1257 (contact was so brief that the Sergeant questioned whether contact had even occurred).

In viewing the facts in the light most favorable to Koistra, the canine bit into her left finger, left hand, left arm, face, mouth and skull for about thirty seconds even though she surrendered by showing herself, putting her hands up and saying "What's going on? I'm unarmed." She suffered a broken jaw and bites to her arms, hands and face. In addition, the canine with his teeth, dragged Koistra by her mouth from the bedroom into the living room for about twelve feet. She was hospitalized for about three or four days, underwent three surgeries for her broken jaw, and suffered facial lacerations and stitches on her face, lacerations and stitches or staples on her left forearm and finger, right finger injury and injury to her skull. (Dkt. No. 58-2, Peacock Decl., Ex. D, Koistra Depo. at 101:9-102:25; 104:1-6.) At the hospital, a tooth was found in her mouth. (Id. at 101:8.)

The Court concludes the use of force in this case was severe. See Miller v. Clark Cnty., 340 F.3d 959, 964 (9th Cir. 2003) (Fourth Amendment intrusion was serious due to unusually long duration of the bite and the plaintiff suffered severe injuries where his skin was torn in four places, and the muscles underneath were shredded and the injury went as deep as the bone.); Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994) (force used to effect arrest was severe as the plaintiff was bitten three times before the canine could achieve an effective hold, gripped his left arm with his jaws and dragged him between four and ten feet from his hiding place causing his arm to be nearly severed); McKay v. City of Hayward, 949 F. Supp. 2d 971, 975, 980 (N.D. Cal. 2013) (amount of force used was "significant" tearing the unintended victim's calf muscle from his leg and exposing tendons and muscle).

### 2. Government's Interest in Use of Force

Next, the government's interest in the force used is determined by assessing (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. Glenn, 673 F.3d at 871 (citing Graham, 490 U.S. at 396). Courts

may also consider other relevant factors such as "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." Id. at 872.

The first factor to consider is the severity of the crime at issue. Here, the officers were at the house searching for Fay who had two prior felony strikes, was considered to be armed and dangerous, had a history of drug abuse, had a psychiatric inmate history, had an active no-bail felony warrant, and was wanted in connection with a recent homicide. This factor strongly favors the County. See Lowry, 858 F.3d at 1257-58 ("seriousness of the suspected crime" favored the City because officers reasonably concluded a burglary was in progress because the building's silent burglary alarm was triggered late at night, the door to the suite was ajar and nobody responded to the Sergeant's warnings to come out); United States v. Hensley, 469 U.S. 221, 229 (1985) (referring to "the strong government interest in solving crimes and bringing offenders to justice); McKay, 949 F. Supp. 2d at 980-81 (in case of an unintended victim to a canine bite, the officers were responding to a "high priority" armed robbery and the city had an important government interest in securing the safety of the community).

The next factor considers whether the suspect posed an immediate threat to the safety of the officers or others. Here, Fay was a wanted two-strike felon, was considered armed and dangerous with a history of drug abuse and psychiatric treatment and was a person of interest in connection with a recent homicide. Fay did not come out when the FTF officers announced themselves outside. The officers did not know if he was armed and he was hiding inside the house. Therefore, Fay posed an immediate threat to the officers' safety because he could have ambushed the officers. See Lowry, 858 F.3d at 1258 (reasonable officer could have believed that burglary was in progress, that the person could be armed and could pose an immediate threat to the officers' safety); Bogle

15

v. Clackamas Cnty., Case No. 15cv0013-SI, 2017 WL 5490870, at *7 (D. Or. Nov. 15, 2017) (officers reasonably believed that the suspect posed a threat to them where the suspect had been in possession of a gun in the past, was an "armed career criminal", had a history of violent criminal activities, and because he was hiding in densely wooded terrain, he had a strategic advantage over them and could ambush them). Moreover, the officers knew that Koistra lived at the home and she was a convicted felon with a drug and theft history and was in violation of her probation. While she did not pose as great of a threat compared to Fay, her possible presence complicated the search since there was a possibility of two individuals hiding in the house that could ambush them. Therefore, this factor strongly favors the County.

An additional important consideration in evaluating law enforcement's interest in the use of force is "whether officers gave a warning before employing the force. Glenn, 673 F.3d at 876; see also Miller, 340 F.3d at 965 (officer was entitled to assume that suspect posed an immediate threat because he was hiding and the officers did not know if he was armed, and had ignored the officer's warnings). Here, the warnings regarding the use of canines were provided repeatedly for more than 15 minutes. Sergeant Davis testified that he announced over a handheld PA system that law enforcement was using a canine that would bite occupants who did not exit the trailer. The command prompted Larry Ford, Koistra's boyfriend, to exit the home. After gaining entry, the announcement was repeated by Sergeant Davis, Deputy Perata and, finally, Deputy Vail prior to releasing Hank in the bedroom where Koista was hiding. Koistra denies hearing any such warnings. However, the Court finds that Koistra lacks personal knowledge relating to the warnings. Cf. Lowry, 858 F.3d at 265 (plaintiff, who claimed she did not hear warnings, lacked personal knowledge where she had been sleeping). Koistra testified that she was prescribed and may have taken Lithium, Depakote, Xanax, and Norco within 24 hours of this incident. (Dkt. No. 58-1, P's Response to Ds' SSUF, No. 37.) She further

stated that she had been awoken from her sleep by the helicopters but did not hear anyone knocking at the door of her home, opening the front door, or entering the house.  Under these facts, the Court finds that there is no genuine dispute that multiple warnings were given which further supports the use of the canine.

Finally, by hiding, Fay and Koistra were passively resisting arrest.  Passive resistance can be considered on the third factor of the government interest analysis.  See Lowry, 858 F.3d at 1258 ("passive resistance can support the use of some force.") (quoting Bryan v. Mac Pherson, 630 F.3d 805, 830 (9th Cir. 2010)); Miller, 340 F.3d at 965-66 (hiding in the woods still considered evading arrest by flight).  Because Fay and Koistra were passively resisting by hiding, this factor slightly favors the County.

The Court also considers whether less intrusive means were available before resorting to the release of the canine.  Plaintiff asserts that Deputy Vail could have waited longer before releasing the canine, could have directed commands to the closet area once he was alerted someone was in that area or could have immediately removed the canine from Koistra but instead allowed the attack to go on for about 30 seconds and encouraged the canine, or the County could have used canines who are trained to "find and bark", not "find and bite."  In assessing alternatives, "officers 'are not required to use the least intrusive degree of force possible.'"  Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994).

As found above, repeated and sustained warnings were given and, therefore, waiting longer before releasing the canine was not an unexhausted alternative.  As to the alternative of "find and bark", Plaintiff has failed to provide any evidence regarding the effectiveness of this alternative technique.  Moreover, "find and bark" would have required Deputy Vail to expose himself to an attack by a person of interest in a homicide investigation who was considered armed and dangerous and had ignored repeated

commands to come out. These conceivable alternatives offer little to counterbalance against the County's interest in the use of canine force.

The remaining alternative offered is that Deputy Vail should have immediately removed the canine and should not have allowed the attack to go on for about 30 seconds. This assertion has less to do with alternatives than it does gauging "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" Espinosa v. City & Cnty. of S.F., 598 F.3d 528, 537 (9th Cir. 2010) (quoting Miller, 340 F.3d at 964). However, viewing the facts in the light most favorable to Plaintiff, Deputy Vail could have employed less intrusive means by releasing the canine's hold on Koistra once she surrendered and after he realized she was not Fay. Instead, Vail allowed the canine to continue to bite Koistra repeatedly and to drag her for about 12 feet.

### 3. Balance Between the Gravity of the Intrusion and Need for that Intrusion

Finally, the Court balances the severity of the intrusion with the government's interest. The Ninth Circuit has observed that characterizing the quantum of force used with regard to the use of a police dog depends on the specific factual circumstances. Lowry, 858 F.3d at 1256-57. This has been interpreted as requiring the Court to analyze each use of the canine, or bite, to characterize its level of force. See Bogle, 2017 WL 5490870, at *5-6. Likewise, the Ninth Circuit has held that excessive duration of a dog bite and the encouragement of a continuation of the attack can constitute excessive force. See Mendoza v. Block, 27 F.3d 1357, 1362 (9th Cir. 1994); Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998). Viewing the facts in the light most favorable to Koistra, the Court concludes that (1) employing the canine to apprehend Fay was reasonable but (2) there is an issue of fact whether the duration and extent of Deputy Vail's use of the canine was an unreasonable use of force.

In this case, Koistra alleges that it was unreasonable for the County to employ canines who were trained to "bite and hold" persons who may be encountered where the canine cannot distinguish whether that person is a child, disabled or dangerous. However, the objective reasonableness of a seizure is determined in the light of the facts and circumstances confronting the police officers. <u>Graham</u>, 490 U.S. at 397. Here, it was reasonable for Defendants to deploy a "bite and hold" canine given that police officers were confronted with a concealed subject who was a wanted felon, a person of interest in a recent homicide, considered to be armed and dangerous, and known to have psychiatric issues.

The remaining question is whether the continued use of the canine following Koistra's alleged surrender was reasonable. Koistra maintains it was unreasonable where she had surrendered, and Deputy Vail, realizing Koistra was not the dangerous suspect being sought, did not immediately command the canine to stop but instead let the canine bite her on the finger, arms, face, mouth, and skull for about 30 seconds and permitted the canine to drag her 12 feet by her mouth. After this occurred, Deputy Vail yelled a command to the dog and the dog bit her again in her jaw. Then Deputy Vail physically removed the canine from Koistra. Moreover, the severity of Koistra's injuries creates an issue of fact whether she suffered an unnecessary, prolonged attack by the canine. If the trier of fact accepts Koistra's account, the use of the canine following her surrender constitutes a severe intrusion on Koistra's Fourth Amendment rights which outweighs the governmental interest in the continued use of force.

"Because [the excessive force inquiry] nearly always requires a jury to sift through factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." <u>Santos v. Gates</u>, 287 F.3d 846, 853 (9th Cir. 2002); <u>see also</u> <u>Torres v. City of Madera</u>, 648 F.3d 1119, 1125 (9th Cir. 2011); <u>Smith v. City of Hemet</u>, 396 F.3d

689, 701 (9th Cir. 2005).  Accordingly, on the excessive force cause of action, the Court GRANTS Defendants' motion for summary judgment with respect to the initial use and deployment of the canine and DENIES the motion for summary judgment on the continued use of the canine after Koistra allegedly surrendered.

**D.    Qualified Immunity**

Defendant Vail asserts the affirmative defense of qualified immunity applies to him.  Plaintiff opposes.  Because the Court granted summary judgment on the excessive force claim on the initial deployment of the canine, the Court only addresses whether Deputy Vail is entitled to qualified immunity concerning the continued "bite and hold" of the canine once Koistra surrendered.

Government officials who perform discretionary functions generally are entitled to qualified immunity from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986).  The United States Supreme Court has presented a two-part analysis for determining qualified immunity claims, which the court may address in any order.   Pearson, 555 U.S. at 236. Qualified immunity protects government officials from liability for civil damages "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  Ashcroft v. al Kidd, 563 U.S. 731, 735 (2011).

When the facts are disputed, in analyzing qualified immunity, the Court assumes "the version of the material facts asserted by the non-moving party" and "draw all reasonable inferences in favor of the non-moving party." Mattos v. Agarano, 661 F.3d 433, 439 (9th Cir. 2011) (citations omitted); Jeffers v. Gomez, 267 F.3d 895, 903 (9th Cir. 2001) ("Where disputed facts exist, however, we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct.").

### 1. Whether the Facts Alleged Show Deputy Vail's Conduct Violated a Constitutional Right

Under the first prong, "the court determines whether the facts alleged, construed in the light most favorable to the injured party, establish the violation of a constitutional right." Dunn v. Castro, 621 F.3d 1196, 1200 (9th Cir. 2010) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Defendant Vail argues that he did not violate Koistra's constitutional rights as his use of force was reasonable under the circumstances. However, in viewing the evidence in the light most favorable to Koistra, the Court concluded there are disputed issues of material fact whether Deputy Vail violated Koistra's constitutional right to be free from excessive force once she surrendered. On a qualified immunity analysis, taking Plaintiff's facts as true and construing them in the light most favorable to her, Deputy Vail acted unreasonably and violated Koistra's constitutional right to be free from excessive force. Accordingly, the Court turns to the second prong of the qualified immunity analysis.

### 2. Whether the Right was Clearly Established

Defendants argue that they are not aware of any controlling precedent existing at the time of the search that would have put Deputy Vail on notice that his actions were a clear violation of Koistra's constitutional rights. Plaintiff responds that preexisting law gave Deputy Vail more than fair warning that the force he used was unlawful.

Public officials are immune from a section 1983 suit unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." City and Cnty. of San Francisco, 135 S. Ct. 1765, 1774 (2015). Under the second prong, the Court must consider whether the alleged Fourth Amendment violations of excessive force and unreasonable seizure "w[ere] clearly established at the time of the officer's alleged misconduct." S.B. v. Cnty. of San Diego, 864 F.3d 1010, 1015 (9th Cir. 2017). "[T]he court decides whether the right is clearly established such that a reasonable government official would have known that 'his conduct was unlawful in the situation he confronted.'" Dunn, 621 F.3d at 1199 (quoting Saucier, 533 U.S. at 202).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal marks omitted). The United States Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna, 136 S. Ct. 305, 308 (2010) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). Recently, the Supreme Court reiterated that "'clearly established law' should not be defined "at a high level of generality." White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting Ashcroft, 563 U.S. at 742). Instead, "the clearly established law must be 'particularized' to the facts of the case." Id. (concluding that appellate court failed to point to a case where an officer acting under similar circumstances as the officer in question was held to have violated the Fourth Amendment). However, in an "obvious case", clearly established can be met "without a body of relevant case law." Maxwell v. Cnty. of San Diego, 708 F.3d 1075, 1083 (9th Cir. 2013) (quoting Brousseau v. Haugen, 543 U.S. 194, 199 (2004)).

On the second prong, the Court looks at whether the right was clearly established prior to January 8, 2016, the date of the incident, such that a reasonable officer would have known that continued and prolonged use of a police canine to effectuate a seizure,

22

when the victim or suspect has surrendered by having her arms up in the air and permitting the continued seizure by the canine for 30 seconds which also included allowing the canine to drag the victim by her mouth for a distance of 12 feet, constitutes a Fourth Amendment violation of excessive force.

In the Court's order on the motion to dismiss, it concluded the law was clearly established that a reasonable officer in Deputy Vail's position would have "fair warning" that his conduct violated the Fourth Amendment relying on Mendoza v. Block, 27 F.3d 1357, 1362 (9th Cir. 1994), Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998), and Preister v. City of Riviera Beach, Fla, 208 F.3d 919, 927 (11th Cir. 2000). (Dkt. No. 42 at 18.)

As a general matter, the use of police canines to search for and apprehend fleeing or concealed suspects is long-standing and widespread, and is lawful. Chew, 27 F.3d at 1447. In Mendoza, the Ninth Circuit, in 1994, recognized that there were only a few cases addressing whether the use of police dogs were lawful and the only circuit opinion was from the Sixth Circuit, Robinette v. Barnes, 854 F.2d 909 (6th Cir. 1988) (addressing the constitutionality of a canine policy and holding that use of police dog was not deadly force and not unreasonable when used to search for a hiding felon). Mendoza, 27 F.3d at 1361 (affirming district court's denial of qualified immunity where law was clearly established, but officer's conduct was not objectively reasonable). Despite the limited police canine cases at the time, the Ninth Circuit noted that officers have considerable guidance on what constitutes excessive force and "no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control" and the officer's use of a police dog in the case was clearly established. Id. at 1361-62. In Mendoza, after the suspect was handcuffed, the canine bit the other side of his body. Id. at 1358.

Meanwhile, in <u>Watkins</u>, the Ninth Circuit, relying on <u>Mendoza</u>, held that it is clearly established that excessive duration of the dog bite and the encouragement of a continuation of the attack could constitute excessive force in violation of the Fourth Amendment. <u>Watkins v. City of Oakland</u>, 145 F.3d 1087, 1093 (9th Cir. 1998). In <u>Watkins</u>, the court affirmed the district court's denial of summary judgment on qualified immunity where the officer allowed the canine to continue to bite the suspect until he showed his hands despite the fact that the suspect was unable to comply because he was recoiling from the pain of the dog bite, and while the suspect was surrounded by police officers with guns drawn. <u>Id.</u> at 1090, 1093. Similarly, the Eleventh Circuit has held that no reasonable officer could believe that the use of a dog to attack and bite a plaintiff, who had immediately submitted to the police when he was discovered, and did not pose a threat of bodily harm or attempt to flee or resist arrest, was lawful force. <u>Preister v. City of Riviera Beach, Fla</u>, 208 F.3d 919, 927 (11th Cir. 2000).

In <u>Chew</u>, the Ninth Circuit affirmed the district court's grant of qualified immunity as to the individual defendants, including the two Sergeants who trained police dogs for the City, and the supervisor in charge of the K-9 unit because the law was not clearly established. 27 F.3d at 1446. In the case, Chew was stopped for a traffic violation and he subsequently fled on foot and hid in a scrapyard. <u>Id.</u> at 1436. The officers learned that Chew had three outstanding warrants for his arrest and called for assistance, including an officer and his canine, and set up a perimeter around the scrapyard. <u>Id.</u> The canine handling officer unleashed the canine two hours after Chew had fled to the yard, and the canine found Chew crouching between two metal bins. <u>Id.</u> Chew claims that once he became aware of the canine's presence, he tried to surrender and yelled at the officers to call off the dog. <u>Id.</u> The canine handler was not within sight of the canine and did not immediately respond to Chew's request. <u>Id.</u> The canine bit Chew several times and then seized him causing severe lacerations on his left side and left forearm. <u>Id.</u> The canine

handler went to trial and the jury found in favor of Chew.  Id.  The district court granted summary judgment as to the other individual defendants based on qualified immunity.  Id.  On appeal, the Ninth Circuit addressed the qualified immunity question as to the two Sergeants who trained the city's canines and the supervisor of the K-9 unit.  The Ninth Circuit distinguished its case from the clearly established law in Mendoza asserting that Mendoza held it is clearly established law that when a deputy allows a canine to seize a suspect who has fully surrendered and is under control, such conduct is unlawful.  Id. at 1448-49.  In Chew, the Ninth Circuit determined that the issue was whether "it was clearly established that it was unlawful to use police dogs to search for and apprehend concealed suspects by biting and seizing them."  Id. at 1449.  Based on the longstanding official policy of the use of police canines in many police departments across the country, the Ninth Circuit held it was not clearly established and the individual defendants were entitled to qualified immunity   Id.

In this case, Defendants fail to identify the "clearly established" proposition of law involved in the case but, rather, summarily argue that they are unaware of any cases that would have put Deputy Vail on notice of the illegality of his actions, and in their reply, fail to address Plaintiff's argument that the law giving notice was clearly established by Mendoza and Watkins.  Meanwhile, in her response, Plaintiff characterizes the salient issues as whether it was clearly established that releasing a canine on a non-violent person and allowing the attack to continue while she was on the ground violated the Fourth Amendment.  (Dkt. No. 58 at 21-22.)

The Court has already ruled that the release of the canine was reasonable and therefore does not require qualified immunity analysis.  As to the prolonged use of canine force, Mendoza and Watkins provided notice that a canine officer cannot continue to use canine force against someone, like Koistra, who had surrendered by putting her arms up and asserted she was unarmed after she heard Deputy Vail tell her to come out.  At that

point, it was clearly established and a reasonable officer would have known that the continued seizure by a police canine after Koistra surrendered for an additional 30 seconds was unlawful.

Accordingly, the Court concludes that Deputy Vail is not entitled to a qualified immunity defense on the continued and prolonged use of the "bite and hold" by the canine after Koistra surrendered, and DENIES summary judgment on this basis.

**E.     Third Cause of Action - <u>Monell</u> Claim**

The SAC alleges that it is the custom, practice and policy of the San Diego Sheriff's Department that when a canine is given the order to "search", the canine will bite anyone that the canine encounters irrespective of whether the person is a suspect, a victim, a child, a disabled person and whether that person poses a threat to anyone.  (Dkt. No. 43, SAC ¶ 66.)  This custom, practice and policy is an alleged violation of the Fourth Amendment because it encourages, permits, and ratifies the use of serious and deadly force upon an individual without considering the <u>Graham</u> factors.  (<u>Id.</u> ¶ 67.)

Defendant argues there is no evidence of any express County policy that directed Deputy Vail's alleged unconstitutional conduct.[7]  Moreover, even if there was an express policy, her claim would still be barred because the Ninth Circuit has held that the use of canines to seize concealed suspects is a long-standing practice and is constitutional.  <u>See</u> <u>Chew</u>, 27 F.3d at 1447  ("No decision of which we are aware intimated that a policy of using dogs to apprehend concealed suspects, even by biting and seizing them, was

_____

[7] Defendants also move for summary judgment on the <u>Monell</u> claim based on ratification, pattern, practice or custom.  Plaintiff does not address these arguments in her opposition.  In reply, Defendants argue that Plaintiff has abandoned her claim for municipal liability based on ratification, pattern, custom or practice by failing to oppose their motion on these issues.  (Dkt. No. 60.)  Because Plaintiff does not oppose municipal liability based on ratification, pattern or practice, the Court GRANTS Defendants motion for summary judgment on these issues.  <u>See</u> <u>Jenkins v. Cnty. of Riverside</u>, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (the plaintiff "abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment.").

unlawful."); <u>Watkins</u>, 145 F.3d at 1092 (noting that there has been no change in the law since <u>Chew</u> that use of police dogs to search and bite was unconstitutional). Plaintiff contends that there is an express "bite and hold" policy, that Deputy Vail acted pursuant to this policy and the "bite and hold" policy was the moving force that caused her injuries.

Cities, counties and other local government entities are subject to claims under 42 U.S.C. § 1983. <u>Monell v. New York City Dep't of Social Servs.</u>, 436 U.S. 658 (1978). While municipalities, their agencies and their supervisory personnel cannot be held liable under § 1983 on any theory of respondeat superior or vicarious liability, they can, however, be held liable for deprivations of constitutional rights resulting from their formal policies or customs. <u>Id.</u> at 691-93. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." <u>Id.</u> at 694. Plaintiffs must establish that "the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation [they] suffered." <u>AE ex rel. Hernandez v. Cnty. of Tulare</u>, 666 F.3d 631, 636 (9th Cir. 2012) (citing <u>Whitaker v. Garcetti</u>, 486 F.3d 572, 581 (9th Cir. 2007)).

A "policy" is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." <u>Fogel v. Collins</u>, 531 F.3d 824, 834 (9th Cir. 2008); <u>Long v. Cnty. of Los Angeles</u>, 442 F.3d 1178, 1185 (9th Cir. 2006). A policy "need only cause [the] constitutional violation; it need not be unconstitutional per se." <u>Chew</u>, 27 F.3d at 1444 (citations omitted); <u>see also</u> <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 123 (1992). In a claim that the County's canine policy causes a constitutional violation, a plaintiff must demonstrate that the seizure was

unconstitutional and that the city's policy was responsible for the constitutional wrong. Chew, 27 F.3d at 1439.

First the Court considers whether Plaintiff suffered a constitutional injury. As discussed above, there are material facts in dispute on whether the prolonged and extended use of a canine following Koistra's surrender was reasonable.

Next, Plaintiff asserts that the County has a "bite and hold" policy and presented the deposition transcript of Jacob Pavlenko, the person most knowledgeable for the County of San Diego. (Dkt. No. 58-2, Peacock Decl., Ex. B, Pavlenko Depo. at 22:2-8.) Pavlenko testified that Sheriff's officers are trained on when to release a canine to search for a suspect according to Section 4.4 of the policy and procedures. (Id. at 22:9-18.) The canines are trained to locate human odor and bite and do not differentiate between good or bad guys. (Id. at 24:10-23.) Deputy Vail testified that when a canine is given the search command, he is taught to bite and hold and is not trained to distinguish whether the person is a child. (Dkt. No. 58-2, Peacock Decl., Ex. A, Vail Depo. at 62:19-24.) In reply, Defendants argue that Plaintiff has presented no evidentiary support that the County has an official policy. She has not presented the written policy, and only cites to Jacob Pavlenko but does not describe who he is and when the policy was adopted and by whom.

While Plaintiff's evidence concerning a policy is scarce as she cites solely to a few sentences in the deposition testimony of Jacob Pavlenko who is the County's person most knowledgeable, in viewing the fact in the light most favorable to Koistra, Pavlenko's testimony reveals a written official canine policy as he references "Section 4.4" of those policy and procedures.[8]

---

[8] Defendants argue that Plaintiff failed to demonstrate that the canine policy amounted to deliberate indifference. Plaintiff does not respond to this argument in her opposition. When a Monell claim is based on an official policy, a showing of deliberate indifference to plaintiff's constitutional right is not

1   Lastly, under the <u>Monell</u> doctrine, Koistra may recover from the County if she

2   demonstrates that the County's "bite and hold" policy "causes" an injury where it is the

3   "moving force" behind the constitutional violation. <u>Monell</u>, 436 U.S. at 694. The first

4   inquiry "in any case alleging municipal liability under § 1983 is the question whether

5   there is a *direct causal link* between a municipal policy or custom and the alleged

6   constitutional deprivation." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385–86 (1989)

7   (emphasis added). This inquiry has been described as a difficult one and has left the

8   Supreme Court deeply divided. <u>Id.</u>

9       Koistra argues that the County's "bite and hold" policy was the moving force of

10  her injuries because "had the County not used canine's (sic) who bite the first person they

11  encounter, Ms. Koistra would have likely not been injured at all." (Dkt. No. 58 at 24.)

12  However, this is insufficient to show that there is "direct causal link" between the policy

13  and the injuries incurred. In this case, the Court has found that initial use of the canine

14  under the "bite and hold" policy was justified because the officers were attempting to

15  apprehend a two-striker felon who was considered armed and dangerous and refused to

16  submit to commands to submit to arrest. It was only after Deputy Vail continued to

17  permit the canine to bite and hold Koistra after she had surrendered that canine force

18  became unreasonable. Plaintiff has failed to demonstrate a County policy authorizing the

19  continued use of the "bite and hold" where the suspect has surrendered. In this case, the

20  "moving force" behind the constitutional deprivation was a failure to reevaluate the need

21  for canine force once the circumstances no longer justified it.

26  required. <u>See e.g.</u>, <u>Lowry</u>, 858 F.3d at 1267 (Thomas, J., dissenting) (deliberate indifference not
    required to be shown if the government's officers acted affirmatively pursuant to an official policy"),
27  Plaintiff does not need to demonstrate that the policy amounted to deliberate indifference.

29

1    As a result, the Court finds Koistra has failed to prove that the "bite and hold

2    policy" was the "moving force" of her injuries.  Accordingly, the Court GRANTS

3    Defendants' motion for summary judgment on the <u>Monell</u> cause of action.

4    **F.    State Law Claims**

5            Plaintiff also alleges state law claims for violation of California Civil Code section

6    52.1, false arrest, battery, assault, intentional infliction of emotional distress and

7    negligence.  (Dkt. No. 43, SAC.)

8            Defendants argue that the state law claims are barred because Deputy Vail's

9    conduct was privileged under California Government Code section 820.2.  Koistra

10   opposes arguing that Deputy Vail is not entitled to section 820.2 immunity because he

11   did not act reasonably during his encounter with her.

12           Section 820.2 immunity protects a public employee's exercise of discretion.  <u>See</u>

13   Cal. Gov't Code 820.2 ("a public employee is not liable for an injury resulting from his

14   act or omission where the act or omission was the result of the exercise of the discretion

15   vested in him, whether or not such discretion be abused.").  A determination whether

16   section 820.2 privilege applies requires a finding that Deputy Vail's conduct was

17   objectively reasonable.  <u>See</u> <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 487 (9th Cir.

18   2007) (defendant officers, relying on section 820.2, were not entitled to summary

19   judgment on state law claims where there were genuine issues of material fact on the

20   reasonableness of the officers' use of force); <u>Robinson v. Solano Cnty.</u>, 278 F.3d 1007,

21   1016 (9th Cir. 2002) (en banc) ("California denies immunity to officers who use

22   excessive force in arresting a suspect.") (citation omitted).

23           Because there is an issue of fact whether Deputy Vail acted reasonably in

24   exercising force upon Koistra once she surrendered, he is not entitled to summary

25   judgment the remaining state law claims on the basis that he is immune from liability

26

27                                                      30

28

under section 820.2. However, she is entitled to summary judgment on these state law claims based on the initial deployment of the canine.

Defendants also contend that the battery claim fails because Deputy Vail's conduct was reasonable under the circumstances and that section 52.1 does not apply because Deputy Vail did not interfere with her constitutional rights. Plaintiff disputes both arguments contending that her Fourth Amendment rights were violated.

To assert a claim for battery against a police officer, and a violation of section 52.1[9], Plaintiff must prove that the officer used unreasonable force. See Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1273 (1996) (battery); Jones v. Kmart Corp., 17 Cal. 4th 329, 331-32 (1998) (the elements of claims under Cal. Civ. Code § 52.1 are similar to claims under § 1983). Because there is an issue of fact as to whether Deputy's Vail's conduct was reasonable and a violation of the Fourth Amendment once Koistra surrendered, the Court DENIES Defendants' motion for summary judgment on the battery and section 52.1 causes of action but GRANTS summary judgment on these causes of action based on Deputy Vail's initial use of the canine.

Defendants further contend that the false arrest claim fails because she admitted violating her probation and was subject to arrest. Plaintiff does not dispute this issue. Defendants reply that Plaintiff has waived this claim. See Jenkins, 398 F.3d at 1095 n.4 (the plaintiff "abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment."). California Penal Code section 847 provides that a peace officer shall have no liability for false arrest or false imprisonment arising out of an arrest that was lawful or the officer had reasonable cause to believe that the

---

[9] The Bane Act provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United States, or laws and rights secured by the Constitution or laws of California." Cal. Civil Code § 52.1(a).

arrest was lawful. Cal. Penal Code § 847. Here, Plaintiff does not dispute that she admitted to violating her probation which subjected her to arrest. Moreover, she does not oppose the summary judgment motion on the false arrest claim and has abandoned that claim. See id. Accordingly, the Court GRANTS Defendants' motion for summary judgment on the false arrest cause of action.

Lastly, the SAC also alleges the County is vicariously liable for state law claims of violation of section 52.1, battery, assault, intentional infliction of emotional distress and negligence. (Dkt. No. 43 at 12-17.) California Government Code section 815.2 provides that a public entity may be vicariously liable for injuries proximately caused by an act or omission of an employee within the scope of his employment. Cal. Gov't Code § 815.2. However, a government entity is not liable for the acts or omissions of an employee if the employee is immune from liability. Cal. Gov't Code § 815.2(b).

Defendants summarily claim that since Deputy Vail is immune from liability, the claims against the County also necessarily fail. Plaintiff disagrees. "Under California law, the county's immunity depends upon whether the police officers are immune." Robinson, 278 F.3d at 1016. Here, because the Court granted summary judgment on all claims as it relates to Deputy Vail's initial deployment of the canine, the Court GRANTS summary judgment as to the County on these same claims. However, because the Court denied Defendants' motion for summary judgment on the state law claims as it concerns the continued use of the canine after Koistra surrendered, the Court necessarily DENIES summary judgment on these causes of action against the County.

## G. Punitive Damages

Defendants argue Plaintiff is not entitled to punitive damages because there is no evidence of evil motive or intent, or reckless or callous indifference to the constitutional rights of Koistra. Plaintiff argues that the manner in which Deputy Vail used the canine was reckless and callously indifferent to her Fourth Amendment right to be free from

excessive force when after she surrendered, he allowed the canine to continue to bite her for 30 seconds during which he allowed the canine to drag her, by her mouth, for about 12 feet.

Punitive damages are permissible in an action under § 1983 when the defendant's conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983). Based on the disputed facts, the Court DENIES Defendants' motion for summary judgment on the punitive damages claim.[10]

## H. Plaintiff's Evidentiary Objections

Plaintiff filed evidentiary objections to Defendants' evidence in support of their motion for summary judgment. (Dkt. No. 58-4.) Defendants oppose. The Court notes the objections. To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence. To the extent that the evidence is not proper, the Court did not consider it.

<b>Conclusion</b>

Based on the above, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment. Specifically, the Court GRANTS summary judgment on the first (excessive force), fourth (violation of section 52.1), sixth (battery), seventh (assault), eighth (intentional infliction of emotional distress) and ninth (negligence) causes of actions as it concerns the initial deployment of the canine and DENIES summary judgment on these same causes of action concerning the continued use of the canine after Koistra had surrendered. The Court also GRANTS summary judgment on

---

[10] Defendants also argue that punitive damages are not recoverable against the County as a matter of law. (Dkt. No. 52-1 at 33.) However, the SAC only seeks punitive damages against Deputy Vail, not the County. (Dkt. No. 43, SAC at 18.) Defendants' argument is without merit.

the third cause of action based on <u>Monell</u> and the fifth cause of action for false arrest.

The hearing set for April 20, 2018 shall be **<u>vacated.</u>**

    IT IS SO ORDERED.

Dated:  April 19, 2018

Hon. Gonzalo P. Curiel
United States District Judge

34